Quidore v. All. Plastics, LLC, 2020 NCBC 39.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

KEVIN QUIDORE,

Plaintiff,

v.

ALLIANCE PLASTICS, LLC; and
RONALD GRUBBS, JR.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 23648

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
AND PLAINTIFF'S MOTION FOR
JURISDICTIONAL DISCOVERY**

1.     **THIS MATTER** is before the Court upon Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and Rule 12(b)(2), North Carolina Rules of Civil Procedure ("Motion to Dismiss"), (ECF No. 10), and Plaintiff's Motion for Jurisdictional Discovery ("Discovery Motion"), (ECF No. 15), (together, the "Motions").

2.     Plaintiff Kevin Quidore ("Quidore") contends that Defendant Alliance Plastics, LLC ("Alliance" or the "Company") promised, but did not provide, certain valuable benefits in connection with his agreement to leave secure employment in California and move to Charlotte, North Carolina to accept a high-ranking position with the Company in 2017.  Alliance moves to dismiss Quidore's claims against it, contending that Alliance is not subject to personal jurisdiction in North Carolina and that, even if it is, Quidore has failed to state an actionable claim for fraud against the Company, necessitating dismissal of at least that claim ("Alliance's Motion to Dismiss").  Quidore opposes dismissal on both theories and brings the Discovery Motion should the Court find Quidore's current evidence insufficient to support personal jurisdiction over Alliance.

3. Defendant Ronald Grubbs, Jr. ("Grubbs") also moved to dismiss Quidore's claims against him, arguing that since Grubbs was authorized to act on behalf of Alliance, the individual claims against Grubbs may not be sustained and, further, that there is no actionable claim for fraud against him ("Grubbs' Motion to Dismiss"). Quidore has since dismissed all claims against Grubbs without prejudice.

4. Having considered the Motions, the related briefing, and the arguments of counsel at the hearing on the Motions, the Court hereby **DENIES as moot** Grubbs' Motion to Dismiss, **DENIES** Alliance's Motion to Dismiss, and **DENIES as moot** the Discovery Motion.

> *Rayburn Cooper & Durham, P.A., by Ross R. Fulton and Matthew Tomsic, for Plaintiff Kevin Quidore.*
>
> *Morton & Gettys, LLC, by James Nathanial Pierce and Beverly A. Carroll, for Defendants Alliance Plastics, LLC and Ronald Grubbs, Jr.*

Bledsoe, Chief Judge.

I.

PROCEDURAL BACKGROUND

5. On December 12, 2019, Quidore filed the Complaint, alleging claims for breach of contract, fraud, and promissory estoppel against Alliance and, alternatively, against Grubbs, Alliance's president and the owner of at least 50% of the Company.[1]  (Compl., ECF No. 4.)

---

[1] In his affidavit filed in support of Alliance's Rule 12(b)(2) Motion, Grubbs avers that he holds "the majority of the membership interest in [Alliance.]"  (Defs.' Mem. Supp. Mot. Dismiss Ex. B, at ¶ 2 [hereafter "Grubbs Aff."], ECF No. 11.1.)

6. On February 3, 2020, Defendants filed the Motion to Dismiss, seeking dismissal of this action against Alliance under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure ("Rule(s)") for lack of personal jurisdiction and against Grubbs under Rule 12(b)(6) for failure to assert facts supporting individual (rather than agency-based) claims against him. Grubbs and Alliance have separately moved to dismiss Quidore's fraud claim against them under Rule 12(b)(6), primarily for failure to allege a misrepresentation of a pre-existing fact.

7. Quidore filed the Discovery Motion on February 24, 2020, seeking jurisdictional discovery concerning Alliance's contacts with North Carolina should the Court find Alliance's jurisdictional contacts insufficient to support personal jurisdiction on the current record.

8. The Court held a hearing on the Motions on March 13, 2020, at which all parties were represented by counsel.

9. After the hearing, on May 6, 2020, Quidore and Grubbs stipulated to the dismissal of this action against Grubbs without prejudice. (Stipulation Dismissal Without Prejudice Claims Against Ronald Grubbs, Jr., ECF No. 25.) As a result, the Motion to Dismiss shall be denied as moot as to Grubbs, and the Court will address only the Motion to Dismiss on the grounds asserted by Alliance.

10. Alliance's Motion to Dismiss and the Discovery Motion are now ripe for resolution.

## II.

## ALLIANCE'S 12(B)(2) MOTION

A.    <u>Legal Standard</u>

11.    "When a defendant challenges the court's jurisdiction under Rule 12(b)(2), the burden falls on the plaintiff to establish that grounds for asserting [personal] jurisdiction exist." *AYM Techs., LLC v. Rodgers*, 2018 NCBC LEXIS 14, at *6 (N.C. Super. Ct. Feb. 9, 2018); *see also Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671, 541 S.E.2d 733, 736 (2001) ("The burden is on the plaintiff to prove by a preponderance of the evidence that grounds exist for the exercise of personal jurisdiction over a defendant.").

12.    In a case where, as here, "both parties submit competing affidavits . . . and the trial court holds a hearing on personal jurisdiction, the trial court should consider the matter as if an evidentiary hearing had occurred." *AYM Techs.*, 2018 NCBC LEXIS 14, at *6–7. "In such circumstances, the trial court must 'act as a fact-finder, and decide the question of personal jurisdiction by a preponderance of the evidence[.]'" *Parker v. Town of Erwin*, 243 N.C. App. 84, 97, 776 S.E.2d 710, 721 (2015) (quoting *Deer Corp. v. Carter*, 177 N.C. App. 314, 322, 629 S.E.2d 159, 166 (2006)); *see also Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694, 611 S.E.2d 179, 183 (2005) (Where there are "dueling affidavits[,]" the Court "must determine the weight and sufficiency of the evidence [presented in the affidavits] much as a juror." (quoting *Fungaroli v. Fungaroli*, 51 N.C. App. 363, 367, 276 S.E.2d 521, 524, *disc. review denied*, 303 N.C. 314, 281 S.E.2d 651 (1981))).

13. Accordingly, the Court makes the following findings of fact and conclusions of law in resolving Alliance's Motion to Dismiss under Rule 12(b)(2) ("Rule 12(b)(2) Motion").

B. Findings of Fact

14. The Court makes the following findings of facts solely for purposes of ruling on the present Rule 12(b)(2) Motion.[2]

15. Grubbs lived in Charlotte, North Carolina at all relevant times herein. Quidore lived in California until he moved to Charlotte in August 2017. (Mem. Law Opp'n Defs.' Mot. Dismiss Ex. A, at ¶¶ 5, 10, 15, 18 [hereafter "Quidore Aff."], ECF No. 14.1.)

16. Alliance is a South Carolina corporation established in 2003, with its principal place of business located in Rock Hill, South Carolina. (Grubbs Aff. ¶ 4.) Alliance is in the business of "converting and distributing stretch film" and "manufacturing cornerboard . . . and industrial quality hand tapes." (Grubbs Aff. ¶ 3.)

17. Quidore lived and worked in California, (Grubbs Aff. ¶ 10), before Grubbs recruited him to become Alliance's Chief Operating Officer ("COO") in late 2016 and early 2017, (Quidore Aff. ¶¶ 4, 6, 10). In recruiting Quidore for Alliance, Grubbs communicated with Quidore through telephone calls, emails, and texts, "some" of which Quidore avers originated from Grubbs' home in Charlotte. In addition, Quidore traveled from his home in California to Charlotte on two separate occasions for multi-

---

[2] Any determination later stated as a Conclusion of Law that should have been stated as a finding of fact is incorporated in these Findings of Fact.

day meetings with Grubbs in North Carolina to discuss and negotiate his potential employment. (Quidore Aff. ¶¶ 5–7, 10–11.)

18. After becoming Alliance's COO, Quidore initially consulted for the Company, which required him to fly into Charlotte from California approximately once a month for five months. (Quidore Aff. ¶¶ 11–12.) Grubbs allowed Quidore to use Grubbs' North Carolina-registered car while Quidore was in the area, (Quidore Aff. ¶ 12), and also encouraged Quidore to visit Charlotte with his family during this time, (Quidore Aff. ¶ 14). To that end, Alliance paid for Quidore to bring his family to Charlotte for a one-week visit prior to his official start date. (Quidore Aff. ¶ 14.)

19. In August 2017, Quidore moved to Charlotte permanently with his family. (Quidore Aff. ¶ 15.) Although disputed by Defendants, (Defs.' Reply Pl.'s Mem. Opp'n Defs.' Mot. Dismiss Ex. B, at ¶¶ 12, 14, ECF No. 19.1), the Court finds that while acting as COO, Quidore performed regular and continuous work on behalf of Alliance in North Carolina, (Quidore Aff. ¶ 16), including meeting monthly with Grubbs in North Carolina to conduct a "comprehensive review of [Alliance's] business," (Quidore Aff. ¶ 19), frequently entertaining, networking, and transacting business in North Carolina with existing customers, suppliers, and vendors, (Quidore Aff. ¶¶ 17, 23–25), and routinely working from his North Carolina home on nights and weekends an average of fifteen hours each week, (Quidore Aff. ¶ 18). The Court further finds that Grubbs approved Quidore's North Carolina-based work for Alliance and often worked on Alliance business in North Carolina as well. (Quidore Aff. ¶ 18.)

20.    Following Quidore's termination from Alliance, Quidore requested a meeting with Grubbs in Charlotte to discuss the termination.  At the meeting, Grubbs advised him that Alliance would not provide the benefits Quidore contends that Grubbs promised him during his recruitment.  (Quidore Aff. ¶ 19.)

C.    Conclusions of Law

21.    Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law.[3]

22.    Alliance argues that the Company, as a South Carolina LLC based in and operating from Rock Hill, South Carolina with no North Carolina property or facilities, is not properly subject to personal jurisdiction in this Court.  (Defs.' Mem. Supp. Mot. Dismiss 7–9, ECF No. 11.)  In opposition, Plaintiff argues that Alliance has submitted to jurisdiction in North Carolina in three ways: (i) by accepting service of process, (ii) by filing a notice of appearance, and (iii) by engaging in constitutionally sufficient minimum contacts with this State both generally and specifically based on its recruitment of, employment of, and refusal to pay benefits to Quidore.  (Mem. Law Opp'n Defs.' Mot. Dismiss 5–16, ECF No. 14.)  The Court declines to address Quidore's first two contentions in light of its resolution of the third.

23.    The Supreme Court of North Carolina has recently reiterated that "[i]n examining whether a nonresident defendant is subject to personal jurisdiction in our courts," trial courts should engage in a "two-step analysis": "First, jurisdiction over the defendant must be authorized by N.C.G.S. § 1-75.4—North Carolina's long-arm

---

[3] Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference into the Court's Conclusions of Law.

statute. Second, if the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Beem USA LLLP v. Grax Consulting, LLC*, 838 S.E.2d 158, 161 (N.C. 2020) (citation and internal quotation marks omitted).

24. "[B]ecause North Carolina's long-arm statute has been interpreted to allow the exercise of personal jurisdiction to the fullest extent allowed under the due process clause, the two-step analysis collapses into one inquiry[,]" *Worley v. Moore*, 2017 NCBC LEXIS 15, at *19 (N.C. Super. Ct. Feb. 28, 2017), namely, "whether [the] defendant has the minimum contacts necessary to meet the requirements of due process[,]" *Filmar Racing*, 141 N.C. App. at 671, 541 S.E.2d at 736 (quoting *Hiwassee Stables, Inc. v. Cunningham*, 135 N.C. App. 24, 27, 519 S.E.2d 317, 320 (1999)).

25. For a court to exercise personal jurisdiction, "there must be sufficient minimum contacts between the nonresident defendant and our state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Skinner v. Preferred Credit*, 361 N.C. 114, 122, 638 S.E.2d 203, 210 (2006) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted). As our Supreme Court explained in *Beem*:

> Personal jurisdiction cannot exist based upon a defendant's "random, fortuitous, or attenuated" contacts with the forum state, *Walden v. Fiore*, 571 U.S. 277, 286, 188 L. Ed. 2d 12, 21 (2014) (quoting *Burger King*, 471 U.S. at 475, 85 L. Ed. 2d at 543), but rather must be the result of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Skinner*, 361 N.C. at 133, 638 S.E.2d at 217 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 1298 (1958)). As such, a defendant's contacts with the forum state must be such that a defendant "should reasonably anticipate being

haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 501 (1980); *see also Skinner*, 361 N.C. at 133, 638 S.E.2d at 217 ("A crucial factor is whether the defendant had reason to expect that he might be subjected to litigation in the forum state.").

838 S.E.2d at 162.

26.     The Court further summarized:

The United States Supreme Court has recognized two types of personal jurisdiction that can exist with regard to a foreign defendant: general (or "all-purpose") jurisdiction and specific (or "case-based") jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–27, 187 L. Ed. 2d 624, 633–34 (2014) (citing *Helicopteros*, 466 U.S. at 414 nn.8–9, 80 L. Ed. 2d at 411 nn.8–9). General jurisdiction is applicable in cases where the defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 180 L. Ed. 2d 796, 803 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317, 90 L. Ed. at 102). Specific jurisdiction, conversely, encompasses cases "in which the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler*, 571 U.S. at 127, 187 L. Ed. 2d at 633–34 (2014) (alteration in original) (quoting *Helicopteros*, 466 U.S. at 414 n.8, 80 L. Ed. 2d at 411 n.8).

*Id.*

27.     Alliance contends that it is not subject to either general or specific jurisdiction in this Court. The Court turns first to specific jurisdiction. As explained in *Beem*:

Specific jurisdiction is, at its core, focused on the "relationship among the defendant, the forum, and the litigation." *Daimler*, 571 U.S. at 133, 187 L. Ed. 2d at 637 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 53 L. Ed. 2d 683, 698 (1977)). Some "affiliatio[n] between the forum and the underlying controversy" is required. *Walden*, 571 U.S. at 283 n.6, 188 L. Ed. 2d at 20 n.6 (alteration in original) (quoting *Goodyear*, 564 U.S. at 919, 180 L. Ed. 2d at 803). The United States Supreme Court has emphasized that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.,*

*San Francisco Cty.*, 137 S. Ct. 1773, 1780 (U.S. 2017) (quoting *Goodyear*, 564 U.S. at 919, 180 L. Ed. 2d at 803).

*Id.* at 162–63.

28. "[F]or purposes of asserting 'specific' jurisdiction, a defendant has 'fair warning' that he may be sued in a state for injuries arising from activities that he 'purposefully directed' toward that state's residents." *Tom Togs, Inc. v. Ben Elias Indus.*, 318 N.C. 361, 366, 348 S.E.2d 782, 786 (1986) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "[T]he trial court must carefully scrutinize the facts . . . to determine if a defendant's dispute-related contacts with the forum state constitute sufficient minimum contacts to exercise personal jurisdiction[.]" *Soma Tech., Inc. v. Dalamagas*, 2017 NCBC LEXIS 26, at *11–12 (N.C. Super. Ct. Mar. 24, 2017).

29. Of particular relevance, our Supreme Court has held that "a single contract may be a sufficient basis for the exercise of [specific] jurisdiction if it has a substantial connection with this State." *Beem*, 838 S.E.2d at 163 (quoting *Tom Togs*, 318 N.C. at 367, 348 S.E.2d at 786). The fact that a contract is "made in North Carolina" and "substantially performed" in the State is particularly relevant for this analysis. *Id.* (quoting *Tom Togs*, 318 N.C. at 367, 348 S.E.2d at 786–87).

30. Significantly for the Court's analysis in this case, in its recent decision in *Beem*, the Supreme Court found specific jurisdiction to exist where, in part, the defendant's representative traveled to North Carolina on three separate occasions and contacted his co-partner in North Carolina once a month to discuss partnership matters, "establish[ing] an ongoing relationship with persons and entities located

within this [S]tate." *Id.* at 164. The Court explained that personal jurisdiction was properly exercised over the defendant, "[g]iven that (1) [the defendant's] contacts with North Carolina all related to [the plaintiff's] partnership agreement and the implementation thereof, and (2) this case is wholly concerned with the conduct of [the defendant] pursuant to that agreement[.]" *Id.* at 165.

31.     Similarly here, Alliance's contacts with North Carolina in connection with Quidore's recruitment, his work for Alliance, and Alliance's alleged breach of contract are directly related to Quidore's claims for payment of agreed-upon benefits and are constitutionally sufficient to permit the exercise of personal jurisdiction over Alliance in this action. In particular, Quidore's claims arise from Alliance's alleged promises during Quidore's recruitment and employment at the Company and from Alliance's decision to terminate Quidore's employment and reject his demands for further payment. (Compl. ¶¶ 35–38, 46–53, 64–67.) Alliance's forecasted defense—that Quidore failed to meet certain employment objectives precluding his realization of any promised benefits and necessitating his termination—arises from Quidore's job performance during his employment. (Defs.' Mem. Supp. Mot. Dismiss 1–2.)

32.     The relevant dispute-related contacts for purposes of determining personal jurisdiction are therefore those Alliance had with North Carolina concerning Quidore's recruitment and performance and Alliance's refusal to pay the benefits Quidore contends are due under the Agreement. *See, e.g., Teague & Glover, P.A. v. Kane & Silverman P.C.*, 2019 N.C. App. LEXIS 92, at *14 (N.C. Ct. App. Feb. 5, 2019) ("When determining whether a contract has a 'substantial connection' with North

Carolina," the Court should consider factors such as: "(1) whether the contract was 'made' in the forum state; (2) whether the defendant knew that the contract was going to be 'substantially performed' in the forum state; (3) and whether the defendant was aware that the other contracted party resided in the forum state." (quoting *Tom Togs*, 318 N.C. at 367, 348 S.E.2d at 786–87)); *see also, e.g., Burger King,* 471 U.S. at 479 ("It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.").

33.     The Court concludes that the following facts establish this Court's specific jurisdiction over Alliance even more persuasively than the defendant's contacts found constitutionally sufficient in *Beem*.

34.     First, the employment contract on which this action is based was solicited from, and substantially negotiated in, North Carolina.  Indeed, Alliance recruited Quidore through telephone calls, emails, and texts, some of which Grubbs originated in North Carolina, and convened at least two multi-day meetings with Quidore in North Carolina to solicit him to join the Company.  (Quidore Aff. ¶¶ 5–7, 10); *see Carson v. Brodin,* 160 N.C. App. 366, 372, 585 S.E.2d 491, 496 (2003) ("By negotiating within the state and entering into a contract with North Carolina residents, defendant purposefully availed himself of the privilege of conducting activities within North Carolina with the benefits and protection of its laws."); *Mabry v. Fuller-Shuwayer Co.,* 50 N.C. App. 245, 251, 273 S.E.2d 509, 513 (1981) ("We find persuasive

the fact that the contract upon which this action for breach is based . . . arose out of solicitations and was substantially negotiated here.").

35. Second, Alliance permitted Quidore to perform the contract in significant part in North Carolina—contract performance that Alliance has forecasted is central to its defense against Quidore's claims. *See Tom Togs*, 318 N.C. at 367, 348 S.E.2d at 786 (finding personal jurisdiction in North Carolina, in part, because defendant knew the contract at issue would be substantially performed in this State). Alliance permitted Quidore to perform regular and continuous work in North Carolina as COO of Alliance, (Quidore Aff. ¶ 16), including working from his Charlotte home approximately fifteen hours each week, (Quidore Aff. ¶ 18), regularly meeting with Grubbs in Charlotte for scheduled comprehensive reviews of Alliance's business, (Quidore Aff. ¶ 19), and entertaining, networking, and transacting business with suppliers, customers, and vendors in Charlotte, (Quidore Aff. ¶¶ 17, 23–25), all to further Alliance's business objectives, *see Chapman v. Janko, U.S.A., Inc.*, 120 N.C. App. 371, 373, 376, 462 S.E.2d 534, 536, 538 (1995) (finding jurisdiction over non-resident, non-domesticated corporation in action for breach of contract for consultation services by resident plaintiff where plaintiff performed substantial services for corporation in North Carolina, even though employer had no employees residing in North Carolina and only made contact with plaintiff from outside North Carolina); *Unitrac, S.A. v. S. Funding Corp.*, 75 N.C. App. 142, 145, 330 S.E.2d 44, 46 (1985) ("Our courts have found that [due process is satisfied] if the contract is made or is to be performed in North Carolina[.]").

36. Third, Alliance's alleged breach of contract occurred in North Carolina. In particular, at a meeting Grubbs convened in Charlotte, Grubbs advised Quidore that Alliance would not pay the benefits that Quidore had demanded and now seeks to recover in this litigation. (Quidore Aff. ¶ 19; Compl. ¶ 30.) Therefore, the act giving rise to Quidore's breach of contract claim occurred in this State, a further basis to support specific jurisdiction over Alliance in this State. *See, e.g.*, *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) ("In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach."); *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999) (to similar effect).

37. Finally, the Court concludes that the quantity, nature, and quality of Alliance's contacts with North Carolina, and the source and connection of Quidore's claims to those contacts, all as discussed more fully above, are sufficient to permit the exercise of specific jurisdiction over Alliance in this action. *See, e.g.*, *New Bern Pool & Supply Co. v. Graubart*, 94 N.C. App. 619, 624, 381 S.E.2d 156, 159 (1989) (listing these, among others, as relevant factors for minimum contacts analysis). And Alliance has offered no persuasive evidence that requiring Alliance to litigate this action in Mecklenburg County, North Carolina, a short distance from its Rock Hill, South Carolina headquarters, would be unfair or unreasonable in the circumstances here. *See Burger King*, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable."); *see also Cherry Bekaert & Holland v. Brown*, 99 N.C. App. 626, 635, 394 S.E.2d 651, 657 (1990) ("When '[t]he inconvenience to defendant of litigating in North Carolina is no greater than would be the inconvenience of plaintiff of litigating in [defendant's state] . . . no convenience factors . . . are determinative of the jurisdictional issue.' " (quoting *Harrelson Rubber Co. v. Layne*, 69 N.C. App. 577, 587, 317 S.E.2d 737, 743 (1984))); *ETR Corp. v. Wilson Welding Serv., Inc.*, 96 N.C. App. 666, 669, 386 S.E.2d 766, 768 (1990) ("Defendant has failed to demonstrate any reason why the exercise of jurisdiction over it would be unfair. North Carolina is as convenient a forum as any to resolve this dispute.").

38.    Based on the foregoing, the Court concludes that Alliance has engaged in various acts in North Carolina by which it has "purposefully avail[ed] itself of the privilege of conducting activities within [this] State," *Skinner*, 361 N.C. at 133, 638 S.E.2d at 217 (quoting *Hanson*, 357 U.S. at 253), and "should [have] reasonably anticipate[d] being haled into court" here, *World-Wide Volkswagen*, 444 U.S. at 297.

39.    Accordingly, for the reasons set forth above, the Court concludes that Alliance has sufficient minimum contacts with North Carolina arising from its recruitment and employment of Quidore, and its refusal to pay Quidore the benefits he alleges Alliance promised to pay, to permit the Court's exercise of specific jurisdiction over Alliance in this action consistent with due process.[4]

---

[4] In light of the Court's determination that Alliance is subject to the specific jurisdiction of this Court in this action, the Court both declines to address Quidore's further contention that Alliance is subject to this Court's general jurisdiction and denies Quidore's Discovery Motion as moot.

## III.

## ALLIANCE'S 12(B)(6) MOTION

A.    Legal Standard

40.    When considering a motion to dismiss under Rule 12(b)(6), the Court views the allegations in the complaint "in the light most favorable to the non-moving party[,]" *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (quoting *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016)), and determines "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[,]" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016)).

41.    "[T]he complaint is to be liberally construed, and the trial court should not dismiss the complaint unless it appears beyond doubt that [the] plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008) (quoting *Meyer v. Walls*, 347 N.C. 97, 111–12, 489 S.E.2d 880, 888 (1997)).

42.    Dismissal of a complaint under Rule 12(b)(6) is proper only: "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

B.    Factual Background

43.    The Court does not make findings of fact in ruling on motions to dismiss, "as such motions do 'not present the merits, but only [determine] whether the merits may be reached.'" *Out of the Box Developers, LLC v. LogicBit Corp.*, 2012 NCBC LEXIS 55, at \*34 (N.C. Super. Ct. Oct. 30, 2012) (quoting *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986)).  The Court only recites those allegations in the Complaint that are relevant to the Court's determination of the Motion.  *See, e.g.*, *Concrete Serv.*, 79 N.C. App. at 681, 340 S.E.2d at 758.

44.    The Court, however, may consider documents to which the Complaint specifically refers.  *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).  Additionally, the Court may "reject allegations [in the Complaint] that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the [C]omplaint."  *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

45.    According to the Complaint, Quidore and Grubbs are citizens and residents of North Carolina, and Alliance is a limited liability company organized and existing under the laws of South Carolina, with its principal place of business also in South Carolina.  (Compl. ¶¶ 1–3.)  Grubbs is currently at least a 50% owner of, and the president of, Alliance.  (Compl. ¶ 3.)

46.    Quidore alleges that he was contacted by Grubbs in 2016, when Quidore was living and working in California, to discuss the possibility of Quidore becoming Alliance's COO.  (Compl. ¶ 7.)  From late 2016 through early 2017, Quidore and

Grubbs negotiated the terms of Quidore's potential employment with Alliance through emails, phone calls, texts, and in-person meetings. (Compl. ¶ 8.)

47. Quidore and Grubbs reached an oral agreement in January 2017 (the "Agreement"). As part of the Agreement, Quidore alleges that the parties agreed Quidore would receive a 10% equity stake in Alliance ("Equity Stake"), a "4xsalary" life insurance policy ("Life Insurance"), and certain performance-based bonuses. Quidore avers that he made clear to Grubbs that these three terms were essential requirements for him to move to North Carolina to work for Alliance. (Compl. ¶ 9.)

48. On January 9, 2017, Grubbs sent Quidore an offer of employment (the "Offer Letter"), setting forth Quidore's proposed salary, benefits, vacation, profit-sharing bonuses, start date, and housing and car allowances. (Compl. ¶ 10, Ex. A.) Quidore rejected the Offer Letter because it did not include provisions regarding the Equity Stake, the Life Insurance, or the performance-based bonuses previously negotiated as part of the Agreement. (Compl. ¶ 10.)

49. Quidore thereafter asked Grubbs to re-draft the documents to include all terms agreed upon in the Agreement. (Compl. ¶ 11.) According to Quidore, Grubbs assured him on January 27, 2017 that the appropriate documents would be drafted and that he should not "wait on fancy documents – we can draw them up when I get a breather." (Compl. ¶ 11, Ex. B.) Quidore also alleges that Grubbs advised that Quidore had Grubbs' "unconditional guarantee" that Quidore would receive both the Equity Stake and the Life Insurance. (Compl. ¶ 12, Ex. B.)

50.     Relying on Grubbs' alleged promises on behalf of Alliance, Quidore accepted Alliance's offer and began his employment with Alliance in June 2017.  (Compl. ¶¶ 12–14.)  In agreeing to take the COO position with Alliance, Quidore agreed to leave secure employment in California, move to North Carolina permanently with his family, and receive significantly less compensation in the form of salary and bonuses than he was receiving in his previous position.  (Compl. ¶ 13.)

51.     During his employment, Quidore repeatedly asked Grubbs to memorialize the Agreement's terms in writing, but, according to Quidore, Grubbs "repeatedly put [him] off," straining the relationship between the two.  (Compl. ¶¶ 15, 17.)  No documents memorializing the Agreement were ever prepared or executed.

52.     On June 17, 2019, Alliance terminated Quidore for what Alliance described as "performance deficiencies[,]" including work attendance issues and paid-time off payouts.  (Compl. ¶ 27, Ex. C.)  Although Quidore acknowledges that he was absent from work for a few days caring for an ill family member out of state, he otherwise denies Alliance's allegations concerning his deficient work attendance and paid-time off payouts.  (Compl. ¶ 29.)

53.     Following Quidore's termination, Grubbs arranged a meeting with Quidore at a Starbucks in North Carolina to discuss the Equity Stake, the Life Insurance, and the performance-based bonuses in the Agreement.  At the meeting, Grubbs denied that Alliance owed Quidore any further compensation and asserted for the first time that the Equity Stake was tied to certain yearly revenue goals, which he said had not been met.  Although Grubbs advised Quidore that Alliance would consider covering

certain of Quidore's post-termination health expenses, Alliance ultimately did not do so. (Compl. ¶ 30.) Despite Quidore's repeated demands, Alliance has not paid Quidore the Equity Stake, the Life Insurance, or the performance-based bonuses Quidore has alleged are due. (Compl. ¶¶ 30–31.)

C. Analysis

54. Although the parties dispute which state's law applies to Quidore's fraud claim against Alliance—North Carolina, South Carolina, or California—Alliance argues that Quidore's claim necessarily fails regardless because Quidore has not alleged with sufficient particularity a false representation of a pre-existing fact, (Defs.' Mem. Supp. Mot. Dismiss 10), a necessary element for fraud under each state's law.[5]

55. Alliance ignores, however, that in each state, if "at the time the promise is made the promisor has no intention to perform and the promisee reasonably relies on the promise to act to his injury, the promise may . . . support an action for fraud." *Gribble v. Gribble*, 25 N.C. App. 366, 369, 213 S.E.2d 376, 378 (1975); *see also Union Flower Mkt., Ltd. v. S. Cal. Flower Mkt., Inc.*, 76 P.2d 503, 506 (Cal. 1938) ("A promise made without any intention of performing it constitutes fraud."); *Page v. Pilot Life Ins. Co.*, 5 S.E.2d 454, 457 (S.C. 1939) (holding "[w]here one promises to do a certain

---

[5] *See, e.g.*, *West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 295 (Cal. Ct. App. 2013) ("The elements of fraud are (1) the defendant made a false representation as to a past or existing material fact[.]"); *Cofield v. Griffin*, 238 N.C. 377, 379, 78 S.E.2d 131, 133 (1953) ("The essential elements of fraud are these: (1) That defendant made a representation relating to some material past or existing fact[.]"); *Jones v. Cooper*, 109 S.E.2d 5, 16 (S.C. 1959) ("Deceit or fraudulent representation, in order to be actionable, must relate to existing or past facts[.]").

thing, having at the time no intention of keeping his agreement, it is a fraudulent misrepresentation of a fact, and actionable as such").

56. Here, Quidore has pleaded that (i) "[Alliance] . . . made false representations of material fact to Quidore, that is, if Quidore accepted the position of COO with [Alliance], then [Alliance] would provide him with" the Equity Stake, the Life Insurance, and performance-based bonuses, (Compl. ¶ 46); (ii) "[Alliance] knew at the time that the representation was false[,]" (Compl. ¶ 47); and (iii) "[Alliance] intended to deceive Quidore because [Alliance] knew Quidore would not take the position of COO without the provision of the Equity Stake, [Life Insurance], and performance-based bonuses[,]" (Compl. ¶ 48).

57. Although Quidore did not formulaically recite language that Alliance knew that it did not intend to pay Quidore the promised benefits at the time the promise was made, his allegations that Alliance knew that its promise to provide future benefits was false when that promise was made says exactly the same thing—that Alliance did not intend to keep its promise of future benefits when it made that promise. Accordingly, the Court concludes both that Quidore has satisfied his burden under Rule 9(b) to plead his fraud claim with particularity, *see Hardin v. York Mem'l Park*, 221 N.C. App. 317, 329, 730 S.E.2d 768, 778 (2012) ("Rule 9 of the Rules of Civil Procedure requires that fraud be pled with particularity. . . . '[T]he particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations.' " (quoting *Bob*

*Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 39, 626 S.E.2d 315, 321 (2006))), and that, viewing the Complaint's allegations in the light most favorable to Quidore, his fraud claim is sufficiently stated to survive dismissal under Rule 12(b)(6).

IV.

CONCLUSION

58. **WHEREFORE**, for the reasons set forth above, the Court hereby **DENIES as moot** Grubbs' Motion to Dismiss, **DENIES** Alliance's Motion to Dismiss, and **DENIES as moot** the Discovery Motion.

**SO ORDERED**, this 19th day of May, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge